IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
SENIOR JUDGE WALKER D. MILLER

Civil Action No. 08-cv-00566-WDM-KLM

BAYVIEW LOAN SERVICING, LLC, a Delaware limited liability company,

    Plaintiff,

v.

DAVID J. BOLAND, et al.,

    Defendants.

## ORDER ON MOTION FOR PARTIAL SUMMARY JUDGMENT

Miller, J.

This case is before me on the Motion for Summary Judgment on Plaintiff's Third Through Sixth Claims for Relief (ECF No. 208) filed by Defendants Wyco Equities, Inc. ("Wyco") and Floyd Legerski ("Legerski"), collectively "Seller Defendants." Plaintiff Bayview Loan Servicing, LLC ("Bayview") opposes the motion. I have reviewed the parties' written arguments and the evidence submitted with their briefs. For the reasons that follow, the motion will be denied.

### Background[1]

This case arises from the sale of office condominium units in a complex in Arapahoe County, Colorado. As I set forth in my Order (ECF No. 185) on the previously-filed Seller Defendants' Motion to Dismiss, Defendant WyCo was the seller of the condominiums and Defendant Legerski was its president. Defendants David Boland, David Corsentino, John

---

[1]The following facts are taken from the parties' briefs and attached exhibits and are undisputed unless otherwise noted.

Morgan, All In One Enterprises, LLC, Matt Morgan ("Defendant Morgan"), Advanced Investments, LLC, Jason Pankoski, and Michael Valdez (collectively, "Buyer Defendants") were all buyers of the condominiums. Buyer Defendants obtained loans for the purchase of the condominiums from third party lenders who thereafter assigned all rights and obligations under those loans to Plaintiff Bayview. Buyer Defendants have since failed to make the required payments, and are now in default on the loans.

In its Second Amended Complaint (ECF No. 49), Plaintiff asserts the following claims against the Seller Defendants: fraud (Third Claim for Relief), civil conspiracy (Fourth Claim for Relief), respondeat superior (Fifth Claim for Relief), and rights in stolen property (Sixth Claim for Relief). Plaintiff's theory is that the Seller Defendants entered into an agreement, dated February 15, 2007, ("the Agreement") with Danny DeGrande of Century 21 Universal Brokerage, LLC ("DeGrande") to solicit individuals to purchase the condominiums and to engage in such conduct as was necessary to complete the purchase and sale of the condominiums. Plaintiff alleges that the Agreement was concealed from the Buyer Defendants and from their lenders, as was DeGrande's relationship with the Seller Defendants. Plaintiff also alleges that, at DeGrande's behest and with the knowledge and consent of the Seller Defendants, the Buyer Defendants misrepresented their financial status and misrepresented that they would use the condominiums for their own businesses, that DeGrande supplied the funds used for the down payments, and that DeGrande obtained inflated prices and appraisals on all of the units. DeGrande allegedly caused Defendant Morgan's signature to be forged on certain promissory note as well as related sales and loan documents. Pursuant to the Agreement, the Buyer Defendants were to be deprived of their voting rights and other rights as members of the condominium

2

association and their rights to transfer or sell their condominiums would be substantially restricted for a period of time, all of which was concealed from Plaintiff's assignors and from Buyer Defendants themselves.

I turn now to the evidence presented by the parties. The February 15, 2007 Agreement is between WyCo, BCL LLC, a Wyoming limited liability company, DeGrande Properties, LLC, and Danny DeGrande. Exh. 2 to Seller Defendants' Mot. to Dismiss, ECF No. 54-1. The Agreement recites that WyCo and BCL own or control all the units in the subject property (the "Units") and that DeGrande Properties "has located various individuals who desire to purchase the Units." *Id.*, Sec. I, ¶¶ E and F. The Agreement thereby sets forth the terms and conditions for the sale of the Units to DeGrande's "investors." *Id.* Sec. I, ¶ G. The Agreement provides that sales on the Units shall be closed no later than April 15, 2008 and that time is of the essence. *Id.*, Sec. II ¶ B. DeGrande Properties is responsible for preparing the sales contracts, following a form attached and incorporated in the Agreement. *Id.*, Sec. II ¶ C. No modification of the sales agreements was permitted. *Id.* All contracts were to be reviewed by WyCo's counsel. *Id.*, Sec. II ¶ D. The Agreement provides that the Units will be sold for no less than $8,500,000 and that if WyCo and BCL have not received the full proceeds by February 15, 2008, "WycCo and BCL shall provide DeGrande written notice of what additional amount is needed to result in WyCo and BCL receiving the total amount of $8,500,00.00 from the sale of the Units (referred to as the 'Shortage')." *Id.*, Sec. II ¶ G. If DeGrande Properties does not fully pay the Shortage, the Agreement terminates and Wyco and BCL retain ownership of all of the units that have not been closed, to dispose of as they wish. *Id.* Until the sellers received the full amount, they would retain management over their units; however, once fully paid, DeGrande

Properties could take over the management of the properties. *Id.*, Sec. II ¶ H. Most pertinent to this litigation, the Agreement further provided that until the sellers were fully paid or until April 15, 2008, "the buyers of the units pursuant to this Agreement shall assign all of their voting and other rights as an owner of the Unit and as a member of the [office condominium association] to WyCo; notwithstanding the foregoing, those buyers shall have the obligation to pay all dues, assessments and other charges that are owed by the members of [the association]." *Id.* Moreover, the Agreement provided that no unit could be transferred or resold by the buyers until either Wyco and BCL had received the full amount of $8,500,000 or until the Agreement was terminated. *Id.*, Sec. II ¶ N.

The Agreement set forth a minimum price of $132 per square foot for the sale of units in one building and $125 per square foot for units in another building. *Id.*, Sec. III ¶ A, Sec. IV ¶ B. DeGrande Properties could direct payment of any amount over the minimum to any entity it wished. *Id.*, Sec. III ¶ B, Sec. IV ¶ C. At the time that WyCo and BCL had received a total of $8,500,000 from the sale of units in both buildings, the title to or proceeds of sales from any remaining units would go to DeGrande Properties or its investors. *Id.*, Sec. IV ¶ D. Plaintiff alleges that in fact total sales proceeds were $8,035,000.00, from which Seller Defendants paid DeGrande approximately $2,483,389.52 in "Courtesy Payments." Second Amended Complaint, ECF No. 49, ¶ 43.

Under the Agreement, DeGrande Properties and DeGrande were not to be paid "any real estate commission, finders fee, brokers fee, or other remuneration or compensation by Wyco, BCL or any investor in regards to its role in locating investors" to buy the units. Agreement, ECF No. 54-1, Sec. II ¶ L. DeGrande Properties and DeGrande were not to be listed on any document as agent, broker or representative of WyCo or BCL. *Id.* The

4

parties further specified that the "relationship between Wyco and [DeGrande Properties] and between BCL and [DeGrande Properties] is not, and shall not be interpreted as, a partnership, joint venture, principal/agent relationship, employer/employee relationship, or other similar relationship." *Id.*, Sec. V ¶ A.

The buyers of the units were unaware of the Agreement and were unaware of the large "courtesy payments" received by DeGrande. They had differing understandings of the role of DeGrande in the transactions. Several buyers testified in their depositions that they thought DeGrande was doing the deal in partnership with Legerski. See Pankoski Dep., ECF No.214-9, at 142-43; J. Morgan Dep., ECF No. 214-11, at 205-6, ECF No. 227-5, at 57; M. Morgan Dep., ECF No. 227-6, at 50. Another buyer was told by DeGrande that DeGrande was selling the units for Legerski. Corsentino Dep., ECF No. 227-3, at 107-8. At least one document apparently listed DeGrande as a listing broker, selling the properties on behalf of the WyCo. Lopez Dep., ECF No. 214-6, at 224.

It is undisputed that there were no direct communications between the Seller Defendants and the lenders (Plaintiff's assignors) and that underwriters at the lenders typically did not communicate with sellers. There is a factual dispute as to whether the Agreement was disclosed to the title company. Representatives of the lenders testified in their depositions that the Agreement would have been material because it would have shown that the sales were not arms' length transactions. Appraisers for the transactions similarly testified that the existence of the Agreement and the role of DeGrande in the sales would have been important in the valuation of the units because it would have shown that the price agreed upon was not the result of real negotiation.

There is no dispute that DeGrande received large courtesy payments from the

5

seller's proceeds, although the record does not reveal the exact total amount (as noted above, Plaintiff alleges the amount exceeds $2 million). Evidence from the lenders establishes that these amounts could not have been deducted from the sales proceeds and directed to DeGrande absent authorization from the sellers. In addition, as a practice, the closing figures were sent to the seller in advance of closing. While the sales were pending, DeGrande had keys to the units and access to the site, which is customary for a seller's agent. Legerski denies that DeGrande was the agent of the Seller Defendants and contends that he was unaware of DeGrande's alleged fraudulent activities. He also contends the payments to DeGrande were made in error.

## Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

## Discussion

Jurisdiction in this matter is based on diversity.[2] 28 U.S.C. § 1332. Therefore, as the parties agree, I apply the law of Colorado in resolving the issues. *Leprino Foods Co. v. Factory Mut. Ins. Co.*, 453 F.3d 1281, 1287 (10th Cir. 2006).

The Seller Defendants assert several arguments in support of their motion: (1) Plaintiff's claims against them are all barred by Colorado's credit agreement statute of

---

[2]Seller Defendants also initially contested jurisdiction in their Motion for Summary Judgment but have abandoned this argument after review of the evidence presented in Plaintiff's Response.

6

frauds, C.R.S. § 38-10-124; (2) the fraud claims fail because there was no reliance by the lenders on the Seller Defendants; (3) the fraud claims fail because the Seller Defendants had no duty of disclosure to the lenders; (4) the respondeat superior claim fails because DeGrande was not the Seller Defendants' agent; (5) Plaintiff cannot seek rescission of the sales contract for units allegedly procured by forged buyer signatures because it already affirmed the sale by foreclosing on those units.

    1.    <u>Statute of Frauds</u>

The Colorado credit agreement statute of frauds provides that, notwithstanding any statutory or case law to the contrary, "no debtor or creditor may file or maintain an action or a claim relating to a credit agreement involving a principal amount in excess of twenty-five thousand dollars unless the credit agreement is in writing and is signed by the party against whom enforcement is sought." C.R.S. § 38-10-124(2). "Credit agreement" is defined as any "contract, promise, undertaking, offer, or commitment to lend, borrow, repay, or forbear repayment of money, to otherwise extend or receive credit, or to make any other financial accommodation," as well as amendments or modifications to such agreements. C.R.S. § 38-10-124(1)(a)(I) and (II). It also includes any "representations and warranties made or omissions in connection with the negotiation, execution, administration, or performance of, or collection of sums due under, any of the credit agreements [otherwise defined]." C.R.S. § 38-10-124 (1)(a)(III). A creditor means "a financial institution which offers to extend, is asked to extend, or extends credit under a credit agreement with a debtor." C.R.S. § 38-10-124(1)(b). A debtor means "a person or entity which obtains credit or seeks a credit agreement with a creditor or who owes money to a creditor." C.R.S. § 38-10-124(1)(c).

The Seller Defendants argue that Plaintiff's claims, at their core, relate to the loans advanced by Plaintiff's assignors to the buyers. Therefore, they contend, because there is no writing by the Seller Defendants, the claims are barred by the statute of frauds. Plaintiff argues that the statute of frauds applies only to disputes between creditors and debtors, not to third parties external to the credit agreements such as the Seller Defendants. I agree with Plaintiff.

This issue was squarely addressed by a division of the Colorado Court of Appeals in *Fisher v. 1st Consumers Funding, Inc.,* 160 P.3d 321 (Colo. App. 2007). In *Fisher*, a mortgage broker offered to arrange a home mortgage refinance loan for the borrowers. According to the borrowers, the mortgage broker promised that the transaction would generate an additional $5000 in loan proceeds for the borrower's use and that the additional $5000 would be documented in a separate contract. However, no documentation was ever created and the borrowers never received the additional amount they had expected. Because the borrowers were unable to produce a writing documenting the promise to secure an additional $5000, the district court dismissed the claim against the mortgage broker. The Court of Appeals reversed, deciding that the mortgage broker was neither a creditor or debtor as defined by the credit agreement statute of frauds and so the claim was not barred. Since the mortgage broker itself had never offered to extend credit, it was not a creditor. The Court of Appeals rejected the mortgage broker's argument that the promises "related" to a credit agreement, holding that the party "against whom enforcement is sought" under § 38-10-124(2) must be a debtor or creditor. 160 P.3d at 324.

The court in *Fisher* considered the effect of another case, *Schoen v. Morris*, 15 P.3d

1094 (Colo. 2000), in which the Colorado Supreme Court held that a direct borrower-lender relationship was not necessary under the credit agreement statute of frauds. In *Schoen*, the plaintiff was a bridge lender who alleged that a primary lender had made assurances that a permanent loan to the borrower would be approved, at which time the bridge loans would be paid off. The permanent financing, however, ultimately failed and the borrower defaulted. The bridge lender brought suit against the primary lender, alleging deceit and other claims based on the alleged misrepresentations. The Colorado Supreme Court held that despite the lack of a direct creditor-debtor relationship between the plaintiff and the defendant, the oral assurance were nonetheless considered to be a credit agreement and the plaintiff was deemed to be a "debtor" for the purposes of section 38-10-124. Therefore, the claim was barred. The court in *Fisher* found no inconsistency between its holding and the *Schoen* case, concluding that *Schoen* "did not alter the statutory requirement that one party be a debtor and the opposing party be a creditor." 160 P.3d at 325.

I agree that the Seller Defendants are neither a debtor nor a creditor as those terms are defined in the statute. The issues here are not about the terms or alleged promises regarding the loans themselves, but rather about conduct leading up to the sales transactions, of which execution of the lending agreements was only a part. Application of the credit agreement statute of frauds also does not make sense in these circumstances – given the lack of communication or relationship between the lenders and the Seller Defendants, a writing would not exist. Therefore, I conclude that the credit agreement statute of frauds does not mandate dismissal of Plaintiff's claims against the Seller Defendants.

    2.    <u>Reliance and Duty of Disclosure</u>

Seller Defendants make two related arguments in opposition to Plaintiff's fraud-based claims. First, they contend that since they had no communications with the lenders, there cannot have been any reliance. Second, they argue that they had no duty to disclose any information to the lenders.

Plaintiff must establish the following elements for its fraud by concealment claim: (1) the defendant concealed a past or present fact which he had a duty to disclose; (2) the fact was material; (3) the defendant concealed the fact with the intent of creating a false impression of the actual facts in the mind of the plaintiff; (4) the defendant concealed the fact with the intent that the plaintiff take a course of action he might not take if he knew the actual facts; (5) the plaintiff took such action or decided not to act relying on the assumption that the concealed fact did not exist or was different from what it actually was; (6) this reliance was justified; and (7) this reliance caused losses to the plaintiff. Colo. Jury Instr., Civil 19:2 (4th ed.).

I conclude that there remain sufficient issues of fact on the questions of reliance and duty to disclose to permit the claim to go forward. As noted by Plaintiff, although there was no direct communication between the lenders and the Seller Defendants, the underwriting process went forward on the assumption that the loans were being sought to finance arms-length transactions. The lenders and the appraisers assumed and relied on the existence of an arms' length negotiation in determining what effect to give the parties' agreed-upon price in determining the properties' value. However, the Agreement was structured to ensure that the Seller Defendants received a specific minimum price for the units, and DeGrande's role was to obtain buyers to purchase at or in excess of that minimum price. Representatives of the lenders have testified in their depositions that they would have

wanted to know this information. Construing the facts in the light most favorable to the Plaintiff, it is apparent that the Agreement, and the role of DeGrande in the transactions, amounted to material information from the perspective of the lenders and the appraisers. Moreover, they took action in reliance upon a belief that would have been corrected had the Agreement, among other things, been disclosed.

Similarly, I disagree that the Seller Defendants had no duty to disclose their relationship with DeGrande and the Agreement governing the transactions as a matter of law. A party to a business transaction has a duty to disclose to the other party facts basic to the transaction if (1) he knows the other party is about to enter into under a mistake as to them; and (2) the other party, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts. *Burman v. Richmond Homes, Ltd.*, 821 P.2d 913, 918 (Colo. App. 1991). Seller Defendants argue that they had no knowledge of any assumptions on the part of the lenders and that there was no relationship between the Seller Defendants and the lenders such that any disclosure would be expected. However, as Plaintiff notes, the sales contract, which was specified by the Seller Defendants pursuant to the Agreement and could not be modified, explicitly provides that DeGrande is a "Transaction-Broker" in the transaction. Exhibit B to Agreement (ECFNo. 54-1). Moreover, there is a space on the sales agreement for "Broker's Compensation Disclosure" where the listing and selling broker(s) were to list their compensation and whether that compensation was to be paid by the seller, buyer, or other. *Id.* Under these circumstances, it is apparent that there is a custom of the trade to disclose compensation arrangements of the broker. Here, there is an issue of fact as to whether DeGrande truly acted as a neutral transaction broker, or

11

in reality acted on behalf of the sellers; there are also questions as to whether the true nature of his remuneration and incentives were disclosed. The Seller Defendants were parties to the sales agreements, which were apparently prepared by DeGrande pursuant to their direction. If the sales agreements were misleading as to the broker's role and compensation, the Seller Defendants may have had a duty to disclose the true facts to those who would rely on the information, including the lenders. *Mallon Oil Co. v. Bowen/Edwards Assocs., Inc.*, 940 P.2d 1055, 1060 (Colo. App. 1996) (noting that a party to a business transaction has a duty to disclose if he or she has stated facts that he or she knows will create false impression unless other facts are disclosed). Given the lack of undisputed facts regarding these key matters, summary judgment is not appropriate on the fraud claims.

    3.    <u>Vicarious liability and agency</u>

The Seller Defendants assert that the undisputed facts demonstrate that DeGrande was not their agent as a matter of law. Therefore, they claim, any vicarious liability claims against them for DeGrande's alleged fraud must fail. I disagree.

The Seller Defendants argue that Legerski testified in his deposition that the Seller Defendants never consented that DeGrande should act on their behalf and subject to their control. Moreover, they argue that the Agreement establishes that no agency relationship was established and that "the parties were on opposite sides of a business transaction." Seller Defendants' Mot. for Summ. J., ECF No. 208, at 16.

An agency relationship results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. *Villalpando v. Denver Health and Hosp. Auth.*, 181 P.3d 357, 362 (Colo.

App. 2007) (citations omitted). Whether an agency relationship exists generally is a question of fact; however, I may decide the issue as a matter of law where the underlying facts are undisputed. *Id.* "[T]he existence of an agency relationship turns on the intention of the parties and is evidenced by their acts, not on what the relationship is called. What is critical is that the parties materially agree to enter into a particular relation to which the legal consequences of agency attach even though those consequences might not have been contemplated by the parties at the time of their agreement." *Gorsich v. Double B Trading Co., Inc.*, 893 P.2d 1357, 1361 (Colo. App. 1994) (citing *Moses v. Diocese of Colo.*, 863 P.2d 310 (Colo.1993)).

Here, as I noted in my Order on the Motion to Dismiss, the disclaimer in the Agreement is not determinative of whether an agency relationship, in fact, exists. ECF No. 185 at 15. Nor is the Seller Defendants' purported lack of consent to enter into an agency relationship. Rather, the Agreement itself demonstrates an arrangement with benefits accruing primarily to the Seller Defendants, in that they would receive a specified minimum price while the buyers would be curtailed in their ability to dispose of the properties and to otherwise enjoy full benefits of ownership. The Agreement also shows that Seller Defendants had a significant amount of control over the terms of the sales agreement and other key elements of the transactions. The evidence establishes that the Seller Defendants and DeGrande had common rather than opposing interests in the business transaction as the Agreement provides that DeGrande's role was to sell the units at a price high enough that he could obtain the profit from any amount over the minimum guaranteed to the sellers. Their interests were therefore in significant alignment. Although DeGrande acted to some extent for his own benefit in securing buyers, it is arguable that the overall

13

structure of the Agreement shows that he was acting primarily on behalf of the Seller Defendants in ensuring that the sales went through at the prices desired by the Seller Defendants. Moreover, there is no dispute that DeGrande received significant payouts from the sales proceeds of the sales of the units and had control over the units while sales were pending, indicating that he was acting on behalf of the Seller Defendants, not merely as a transaction broker. Finally, there is additional evidence of control on the record, including that the Seller Defendants had the power to authorize the payments to DeGrande and closely followed the status of the sales process. On this record, a reasonable jury could find that DeGrande acted as an agent for the Seller Defendants.[3]

    4.    <u>Election of Remedies</u>

Plaintiff's Sixth Claim, for rights in stolen property under C.R.S. § 18-4-405, is premised on the allegedly forged signature of Defendant Morgan on several loan documents. In deposition testimony, Defendant Morgan acknowledges signing sales and loan documents with respect to one unit, but his signature appears on sales and loan documents for three additional units. Because the loan proceeds for the three units were paid to the Seller Defendants, Plaintiff contends it is entitled to recover from them the allegedly stolen funds in their possession. Seller Defendants contend that this remedy essentially seeks to repudiate the loan transactions and that Plaintiff is barred from doing so because it already affirmed the loans by seeking foreclosure on the properties.

Under Colorado law, a party may not pursue inconsistent remedies. *Trimble v. City*

---

[3]Whether or not the allegedly fraudulent acts taken by DeGrande were within the scope of that agency or otherwise known or ratified by the Seller Defendants are not at issue in the motion.

14

*and County of Denver*, 697 P.2d 716, 723 (Colo. 1985) ("A remedy based on affirmance of the contract is inconsistent with a remedy, arising out of the same facts, based on disaffirmance and rescission.") (superseded by statute on other grounds). However, election of remedies is considered a "harsh doctrine" which should not be unduly extended. *Sims v. Sperry*, 835 P.2d 565, 567 (Colo. App. 1992).

In response, Plaintiff asserts that it did not elect its remedies at the time it foreclosed on the properties because it was unaware of the forgery at that time. Plaintiff has presented evidence that it commenced the foreclosure actions on or around April 1, 2008 and May 28, 2008. However, it was not until June 27, 2008 that Plaintiff learned that Defendant Morgan denied that his signature was genuine as to several of the units. Plaintiff moved to file its Second Amended Complaint, which asserts the claim based on the alleged forgery, on August 1, 2008. ECF No. 40. On October 5, 2009, at his deposition, Defendant Morgan confirmed under oath that his signature was forged. It appears that the court orders authorizing the sales of the properties were filed April 29, 2008, May 6, 2008 and June 24, 2008. Exhibits 8-14 to Reply to Seller Defendants' Mot. to Dismiss, ECF No. 76-8 to 76-14. The parties have not directed me to any evidence regarding when Plaintiff took title to the three disputed units.

I conclude that summary judgment in Seller Defendants' favor on this claim is not appropriate. First, Seller Defendants have not carried their burden to present undisputed evidence showing that Plaintiff knew of the forgery at the time it foreclosed and took title to the disputed properties.[4] If Plaintiff was unaware of the forgery at that time, it could not

---

[4]Because of this lack of evidence of knowledge of the forgery, I disagree with Seller Defendants that the doctrine of judicial estoppel should bar the claim.

15

have sought to rescind the sales agreements and loans; therefore, I do not see how its actions in foreclosing could be considered an election. In addition, the doctrine of election of remedies appears to apply to a party seeking inconsistent remedies in the same proceeding. Here, however, the foreclosure was a separate action, and it does not appear that the Plaintiff is seeking inconsistent remedies in <u>this</u> proceeding. Seller Defendants have not identified any legal authority applying the doctrine of election of remedies where a party took one course of action in an earlier proceeding but sought different relief based on changed facts in a second proceeding. Accordingly, I disagree that Plaintiff is barred as a matter of law from proceeding with its claim for the sale proceeds under C.R.S. § 18-4-405 at this time, even if this remedy is based to some extent on a theory of rescission.

Nonetheless, I agree with Seller Defendants that it would be inequitable to permit Plaintiff to receive a windfall or double recovery by permitting it to retain the foreclosed properties (or any proceeds from reselling them) while obtaining disgorgement of the loan amounts from the Seller Defendants. *Lakeside Ventures, LLC v. Lakeside Development Co.*, 68 P.3d 516, 519 (Colo. App. 2002) ("The doctrine of election of remedies prevents double recovery by requiring a party to make an election when the remedies sought are inconsistent and contradictory."). I would therefore seek additional argument and authority on this issue in the event that Plaintiff succeeds in showing that the signatures were indeed

forged and other elements required to sustain the claim.

Accordingly, it is ordered:

1. The Motion for Summary Judgment on Plaintiff's Third Through Sixth Claims for Relief (ECF No. 208) is denied.

DATED at Denver, Colorado, on July 21, 2010.

BY THE COURT:

s/ Walker D. Miller
United States Senior District Judge